## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GEORGE GALLEGOS**

                    **Plaintiff,**

**v.**                                              **Civ. No. 15-00638 RB-KK**

**RICHARD TRUJILLO and JASON**
**GALLEGOS, in their individual capacities, and**
**THE CITY OF ESPANOLA,**

           **Defendants.**

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
## THE INDIVIDUAL DEFENDANTS

### I.  Introduction.

On February 21, 2014, Plaintiff George Gallegos walked with his son and his partner's daughter to the school bus stop on Railroad Avenue in Espanola, New Mexico, to wait for the bus.   As a result of cancer surgery in1986, Plaintiff, then age 48, has a total prosthesis on one knee and has only a metal rod from his hip to his knee.  Slight in size, Plaintiff is totally disabled and it is obvious he is disabled by watching him walk.

Around 7:45 a.m. Espanola City police officers Defendants Trujillo and Gallegos arrived at the bus stop in separate units.  They had received a call from Dispatch stating that a man wearing a grey, hooded sweatshirt had been seen standing in the street, "flipping off cars."  The caller did not reveal her name to 911.   The dispatcher called Defendants and stated that someone who "was just passing by" reported seeing a man "standing in the middle of the road, throwing fingers at vehicles as they pass by." Defendants had no idea of who had called Dispatch and received no information that the man was armed or that any type of verbal or physical altercation had occurred.

Viewing the fact in the light most favorable to Defendants,[1] when they arrived at the bus stop area they saw Plaintiff standing with the two children.  They did not know his name or who he was and had no information about him. He was not doing anything unusual.   They did not see a weapon.  Plaintiff asked: "What's up?"  Defendant Gallegos told Plaintiff to come over to the police units.  Defendant stated this was a consensual encounter and Plaintiff was not required to respond.  However, according to Defendants, Plaintiff did as he was told and began walking towards them with his hands in his pockets.  Defendant Gallegos told Plaintiff to take his hands out of his pockets.  Plaintiff failed to do so but continued to walk towards Defendants as he had been told to do.

Defendants then grabbed Plaintiff by his arms.  Defendant Trujillo had Plaintiff's left arm and Defendant Gallegos had his right arm.  Defendants put both of Plaintiff's arms behind his back and handcuffed him.  According to Defendant Gallegos, at this point he did a pat down on Plaintiff and Plaintiff was then put, handcuffed, in the back of Defendant Gallegos' police car.  Plaintiff was then taken from the bus stop to his house, which was located less than a block away.  After the handcuffs were taken off, Plaintiff was told by Defendant Trujillo that he was to stay away from the bus stop.

Prior to being handcuffed, Plaintiff did not fight with the Defendants or argue with them, yell at them or try to attack them and did not attempt to flee.  Defendants had not seen any weapon on Plaintiff and, in fact, Plaintiff had no weapons on him.  Defendants had no probable cause to arrest Plaintiff at the time they placed him in handcuffs and, indeed, had no evidence that he had committed a crime.   Defendants handcuffed Plaintiff simply because Plaintiff had failed to take his hands out of his pockets when told to do so.  Defendants did not prepare a

---

[1] Plaintiff's version of the incident is very different from that of Defendants.  See, Ex. 1, affidavit of George Gallegos, ¶¶ 4-8.  Because Plaintiff seeks summary judgment, the facts set forth herein as undisputed will be the facts viewed in the light most favorable to Defendants.

police report on the incident that day.  Nor did they inform the dispatcher, as they were trained to do, that Plaintiff had been handcuffed or that Plaintiff had been placed inside a police unit or that they had transported Plaintiff from one place to another. In fact, no report was done until March 31, 2014, after Plaintiff filed a complaint with Espanola Chief of Police Eric Garcia.

The manner in which Defendants' handcuffed Plaintiff caused him to suffer excruciating pain in his left arm and shoulder.  He had felt some left shoulder pain prior to February 21, 2014, and the manner in which the handcuffing was done, at minimum, aggravated a pre-existing injury.  Shortly after Defendants left his home, Plaintiff sought medical attention at Concentra Medical Center in Santa Fe, New Mexico where he was treated for "trauma to left arm/shoulder." Plaintiff was prescribed pain medication and told to follow up with his own doctor and to undergo physical therapy.  He was examined at the Espanola Hospital on March 8, 2014, and was treated by Dr. Herbert Rachelson, an orthopedic surgeon, for several months with no improvement.  As a result of the manner in which he was handcuffed, Plaintiff underwent surgery during September 2014..  Dr. Rachelson performed the surgery and the post operative diagnosis was "impingement bursitis, left shoulder."  Plaintiff's injury and the need for surgery was directly caused or aggravated by the handcuffing of February 21, 2014.

In this motion, Plaintiff seeks summary judgment on his claim that his Fourth Amendment right to be free from unreasonable seizure of his person was violated when Defendants, acting on the basis of an anonymous tip reporting conduct that was not even a crime, handcuffed him and placed him inside a locked police car.[2] Plaintiff contends that the undisputed

---

[2]  Plaintiff does not seek summary judgment on his claim that the manner in which the handcufffs were applied constituted an unreasonable force, a related but separate legal issue. *See, Cortez v McCauley,* 478 F.3d. 1108, 1126 (10th Cir. 2007)(en banc). Under Tenth Circuit precedent, if Plaintiff successfully proves an unlawful arrest or seizure, he would be entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonable employed in effecting the arrest. *See Romero v. Story*, 672 F.3d 880 (10th Cir. 2012) (citing **Cortez v. McCauley,** *supra,*478 F.3d. at  1114-15.

facts demonstrate that the actions of Defendants were unreasonable given the totality of the circumstances and that they expanded the initial encounter into a de facto arrest requiring probable cause for which they had no probable cause.  Plaintiff also seeks summary judgment because his continued detention in the back of the police unit, in handcuffs after Defendants had ascertained that he had no weapons in his pockets, violated his Fourth Amendment rights. Counsel for Defendants has been contacted and opposed this motion.

## II.  The Law On Summary Judgment.

Summary judgment is proper only if there are no genuine issues about material facts. FRCP 56.  Movant must demonstrate the absence of a genuine issue of material fact.  ***Celotex Corp. v. Catrett***, 477 U.S. 317, 321-23, 106 S.Ct. 2548, 2552-53 (1986).  In evaluating whether the facts establish a genuine issue for trial, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences from the record in favor of the non-movant.   Only if viewed in that light, the evidence is such that a reasonable jury could not return a verdict for the non-moving party, will summary judgment lie.   ***Anderson v Liberty Lobby, Inc.*** 477 U.S. 242, 249 (1986.  The court is not entitled to weigh evidence or pass on the credibility of witnesses in deciding summary judgment issues. ***Id., Zuchel v. Spinharney***, 890 F.2d. 273, 276 (10th Cir. 1989).

In determining whether an officer possessed sufficient facts to justify a search or seizure, the Court must rely on the testimony presented in the record.  ***United States v. Melendez-Garcia***, 28 F.3d. 1046, 1052-52 (10th Cir. 1994); ***United States v. Matthews,*** 458 Fed. Appx.717, 722 (10th Cir. 2012); ***United States v. Turner,*** 2013 WL 5727404 *9 (D. Kan.).

## III.  Statement of Undisputed Material Facts.

1.  On the morning February 21, 2014, Plaintiff was at the school bus stop on Railroad

Avenue, in Espanola, New Mexico, waiting with his son and the daughter of his partner for the

school bus.  Plaintiff was 48 years old, about 5'8' and 135 lbs.  As a result of cancer, Plaintiff

has a complete prothesis on his right knee secondary to a bone tumor and has only a metal rod

from his hip to his knee.  He is totally disabled.   His knee is so unstable that it gives way

sometimes and causes him to fall.  He cannot run and that he is disabled is apparent to anyone

who sees him walk due to his obvious instability.  Ex. 1, Affidavit of George Gallegos, ¶¶ 1-2;

Ex. 2, Concerta Medical Clinic records, Feb. 21, 2014.

  2.  Around 7:45 am, the 911 Dispatcher received an anonymous call from a woman who

stated that there was a male on Railroad Avenue wearing a grey sweatshirt with a hood who had

been standing in the road, "flipping off" passing cars.   The caller did not claim this person had

weapon or was arguing or fighting.  The dispatcher called Defendant Gallegos and informed him

that someone who "was just passing by" reported seeing a man in a "grey sweater" "standing in

the middle of the road, throwing fingers at vehicles as they pass by."  Defendants did not know

who the caller was but were told that the caller was no longer in the area.  They were not aware

of any witnesses to the alleged throwing of fingers.  Ex. 3, 911 Dispatch tape of calls, Feb. 21,

2014, at 0:00-3:00[3]; Ex. 4, deposition of Jason Gallegos, pp. 24(6-16); 32(5-21), 33(13-25),

34(1-8), 36(9-19).[4]

  3.  Defendants were not told that there was a weapon involved or that the man had thrown

---

[3] The document attached as Ex. 3 to this Motion is a photocopy of the cd that is being mailed to the Court.

[4] Defendants initially claimed the dispatcher had told them the man was throwing rocks at cars.  However, when confronted with Ex. 3 both admitted they had not received  any such information.  Ex. 4, pp. 22(10-25). 23(1-17), 37(16-23, 24-25), 38(1-14); Ex. 5, pp. 53(5-15); 59(15-22).  Even if they had not, their denial of what is on the 911 tape could not create a dispute of material fact.  "When opposing parties tell two different stores, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *See, e.g., Scott v. Harris*, 550 U.S. 372, 379-380 (2007) (in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape which captured events underlying excessive force claim)." *Martinez v Mares,* 14-cv-00041 WJ-KBM *Doc. 48* at 13, 16. (Memo. Op. and Order granting plaintiff partial summary judgment).  8/27/14).

5

rocks at a car or that there had been an argument going on or that the individual had been yelling

or screaming or that he had used "fighting words" of any sort or that he had been throwing rocks

at cars or that there was any threat of a fight breaking out or that there had been any act of

violence. The only information they had was that a man in a grey sweater had "thrown fingers"

at cars as they passed by.  Defendants knew that was not a crime. Ex. 4, pp. 37(16-23, 24-25),

38(1-14), 39(16-18), 40(9-15), 59(6-11), 61(4-11); Ex. 5, pp. 66(3-11, 22-25), 67(1).

4.  Both Defendants, who had been eating breakfast together, responded to the call in

separate units.  Defendant Trujillo was the senior officer at the scene as Gallegos was a

probationary employee.   Ex. 4, pp.  47(23-25), 48(1-7), 74(2-4, 9-11).

5.  Defendants arrived at the bus stop at approximately the same time.  Defendants

observed a man, Plaintiff, standing quietly by two children.  According to Defendant Gallegos,

Plaintiff was wearing a blue jean jacket.  He did not meet the description that the dispatcher had

received from the anonymous caller.   Defendants did not know his name or who he was.  He

was a complete stranger to them. Plaintiff was not doing anything wrong nor was he doing

anything that was even suspicious. Ex. 1, ¶3; Ex. 4, pp. 18(3-13), 48(2-7, 13-21, 25), 49(1-16),

56(12-15), 61(12-17); Ex. 5, pp. 50(2-9).

6.  Defendants knew that "throwing fingers" was not a crime and had no evidence that

Plaintiff had committed a crime.  Plaintiff was standing quietly.  Defendants did not see any

weapon.  Plaintiff did not attack Defendants nor did he try and run away.  Defendants claim they

just wanted to talk to Plaintiff.  Defendant Gallegos claims he told Plaintiff to walk over to his

police car.  He could not recall the distance between he and Plaintiff except it was close enough

for Plaintiff to hear him.  At this time, Defendant had no evidence that Plaintiff had committed a

crime and had no evidence that Plaintiff had a weapon.  According to Defendant Gallegos, this

was a consensual encounter[5] and Plaintiff was not required to obey him.  According to

Defendants, Plaintiff asked: "What's up?" and did as he was told, walking over to them with his

hands in his pockets[6].  Defendants' state Plaintiff was told twice to take his hands out of his

pockets but did not do so.[7]  Ex. 4, pp. 49(2-4, 21-25), 50(1-16), 51(7-11, 52(5-14), 61(12-24),

90(10-16); Ex. 5, pp. 63(11-13).

7.  According to Defendants, Plaintiff continued to walk towards them.  Defendants claim

that after Plaintiff failed to take his hands out of his jacket pockets, According to Defendant

Gallegos, when Plaintiff was close to him, Defendant "grabbed his right forearm and pulled his

hands out of his pockets."  According to Defendant Gallegos, he grabbed Plaintiff in order to

place him in handcuffs.  Defendant had not observed a weapon on Plaintiff.  Plaintiff had not

tried to attack either Defendant prior to Defendant Gallegos grabbing his arm and placing him in

a "C-clamp hold."  Nor had Plaintiff attempted to flee.  Ex. 4, pp. 27(17-24), 61(12-25); Ex. 5,

pp. 88(9-12, 22-24), 89(1-9).

8.  According to Defendant Gallegos, after he grabbed Plaintiff to handcuff him, Plaintiff

"kind of pulled away" from his hold and Defendant Trujillo "assisted" in the handcuffing.

Defendant Trujillo was yelling at Plaintiff.  Defendant Trujillo twisted Plaintiff's left arm up and

behind his back while Defendant Gallegos had Plaintiff's right arm.  Before he was handcuffed,

Plaintiff was facing towards the police unit when Defendants had his hands behind his back.  His

---

[5] Defendant Trujillo stated he had no opinion on the nature of the encounter. Ex. 5, p. 71(3-15).

[6] It was a cold February morning and there was nothing unusual about a person having his hands in his pockets Nor
was it a crime.  Ex. 4, p. 53(20-25); Ex. 5, p. 64(22-25), 65(1-3).

[7] Plaintiff contends that when he asked Defendants "What's up?" his hands were turned upwards, were not in his
pockets, and that Defendants approached him., that Defendant Trujillo told him they were tired of getting calls and
aggressively grabbed him by his left arm and painfully twisted it up behind his back while shoving Plaintiff onto a
police car to be handcuffed.  Plaintiff could not see who had his right arm behind his back while he was being
handcuffed but assumes it was Defendant Gallegos.  Ex. 1, ¶¶4-5.  However, because this is Plaintiff's Motion for
Summary Judgment, the facts are those viewed in the light most favorable to Defendants.

face was on the car. Plaintiff was crying out in pain during the handcuffing[8]. Ex. 1, ¶5; Ex. 4, pp. 27(17-24), 62(1-21), 63(1-9); Ex. 5, pp. 73(8-10), 74(10-12).

9.    Plaintiff was placed in handcuffs because he failed to take his hands out of his pockets after being told to do so.   When Defendant Gallegos first grabbed Plaintiff and prior to the time Plaintiff was handcuffed, Defendant Gallegos had pulled Plaintiff's hands out of his pockets.  Plaintiff had no weapons in his hands or in any pocket.  Defendant Trujillo did not know what Defendant Gallegos to think there was a need to handcuff Plaintiff or why Defendant Gallegos grabbed him. Ex. 1, ¶8; Ex. 4, pp. 27(17-24), 50(1-8), 60(6-18); Ex. 5, pp. 79(18-25), 80(1).

10.    According to Defendant Gallegos' March 31, 2015 report,[9] he conducted a pat down for weapons and then put Plaintiff, handcuffed, in the police car.   It is undisputed that Defendants did not tell Plaintiff that they wanted to pat him down to look for weapons prior to the time Defendant Gallegos grabbed Plaintiff to apply the handcuffs.  Plaintiff had no weapons. Ex. 1, ¶5; Ex. 6, Defendant Gallegos March 31, 2014, report; Ex. 4, pp. 63(10-12); Ex. 5, p. 89(7-9).

11.    While Defendants had no evidence that Plaintiff had committed a crime, Plaintiff

---

[8] Plaintiff's testimony that the manner in which he was handcuffed caused him to cry out in pain is undisputed as Defendants  do not deny this but claim they cannot recall if the handcuffing caused Plaintiff to cry out.  Ex. 4, p. 62(19-20), 80(15-17); Ex. 5, p. 74(10-15).

[9] No police report was done on this incident despite the fact that Defendants had forcibly handcuffed an indiviual, placed him inside a police car and transported him until Plaintiff's attorney filed a complaint on or about March 10, 2015.  Ex. 4, pp16 (1-9, 24-25),17(1);  Ex. 5, p. 107(7-11).  Defendant Gallegos wrote in his March 31, 2014, report that the dispatcher told the officers that the man on Railroad Avenue was reportedly "throwing rocks" at passing cars.  Defendant, after listening to the tape of his conversation with the dispatcher admitted he had not been told this. . Ex. 4, p. 32(1-21).  Defendant also wrote that prior to this call, "numerous calls" had been received by the dispatcher regarding an individual throwing rocks at passing cars and initially testified to that effect.  However, the 911 call logs for the three months prior to February 21, 2014, showed no dispatcher calls regarding a man throwing rocks at passing cars. Defendant claimed he learned of these alleged prior incidents **after** the February 21, 2014, inicdent.  He claimed he could not remember who told him this.  Ex. 4, pp. 28(22-25), 29(1-18), 42(22-25), 43(1-4, 8-25); 44(1-22), 87(1-11); Ex. 7, Espanola-Rio Arriba 911 Center call logs from November 21, 2013-February 21, 2014.

was not released because Defendants wanted to talk to him   Defendants were not going to leave Plaintiff at the bus stop and he had to leave that area.  At some point, Defendants ordered Plaintiff to stay away from the area of the school bus stop.    Plaintiff states that he was not allowed to walk away and states that Defendants drove him to his house, which was located only about three houses north of the bus stop.  Defendant Trujillo stated Plaintiff was "escorted" to his residence and claims he does not know why Plaintiff was placed in the police unit or why he was "escorted."  Defendant Gallegos testified that Plaintiff was not going to be allowed to remain in the area of the bus stop and was told he had to leave.  Defendants claims that after he asked Plaintiff where he lived, he asked Plaintiff if he wanted a ride there and Plaintiff said "yes."[10] Ex. 1, ¶6-7; Ex. 4, pp. 63(10-12), 64(4-13), 65(21-25), 69(2-13); 70(5-10); Ex. 5, pp. 84(17-19, 23-25), 85(1-15).

12.  Plaintiff was not released from the handcuffs until after Defendants arrived at his house with him.  Plaintiff was in great pain as a result of the handcuffing.  His pain was increased by having to remain with his hands cuffed behind his back for about eight minutes. Ex. 1, ¶¶6-7; Ex. 4, p. 73(17-19).

13.  Defendant Trujillo admitted there was no legal basis to continue to detain Plaintiff once a pat down revealed he did not have a weapon.  He had no idea why Plaintiff was not released and told he could go home. Although he issued a verbal command to Plaintiff  ordering Plaintiff to stay away from the bus stop area, Defendant admitted there was no legal authority to tell Plaintiff to stay away from the bus stop.  Ex. 5, pp.  91(12-20), 92(23-25); 98(9-18); 107(16-22).

---

[10] Although Defendants were trained that they were to radio in any time they left the scene of an incident and any time they exited their unit and any time a person was placed inside a police car, Defendants did not radio in that Plaintiff had been placed inside a police unit or that he was being transported from the scene of the incident.  Ex. 4, pp. 71(16-25),72(1-25), 73(1), 16 (1-9, 24-25),17(1).

14.  Plaintiff, who had experienced some pain in his left neck and shoulder area in the months prior to having his left arm twisted behind his back during the handcuffing process, was in great pain.  The handcuffing resulted in his left shoulder now feeling much more serious pain.  Shortly after Defendants drove away from his home, Plaintiff went for medical treatment at the Concentra Urgent Care Center in Santa Fe, New Mexico.  Plaintiff was diagnosed with a shoulder sprain.  Ex. 1, ¶9; Ex. 2, Concentra Urgent Care Records, Feb. 21, 2014.

15.  In the days and weeks after the incident, the pain in Plaintiff's left shoulder grew worse to the point that he was having problems using his left arm.  On March 8, 2014, he went to the Espanola Hospital emergency room.  He was referred to Dr. Herbert Rachelson, an orthopedic surgeon and saw him on May 14, 2014.  Dr. Rachelson recommended surgery for bursitis impingement in the left shoulder and performed the surgery on September 14, 2014.  The bill for the surgery, not including Dr. Rachelson's fee, exceeded $15,000.  Plaintiff's total medical expenses, including postoperative physical therapy, exceed $25,000.00.  Ex. 1, ¶10;  Ex. 7, Espanola Hospital record from March 8, 2014; Ex. 8; Dr. Herbert Rachelson records from May 14, 2014, and September 4, 2014; Ex. 9, bill from Presbyterian Hospital for September 4, 2014, surgery.

## IV.  Defendants' Use of Handcuffs In Their Seizure of Plaintiff Violated Clearly Established Fourth Amendment Law.

The Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests. Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing. An officer is free to approach people and ask questions without violating the Fourth Amendment.  However, the person approached under these circumstances is free to refuse to answer questions and to end the encounter.  On the opposite extreme are arrests, which are 'characterized by highly intrusive or lengthy search or detention.'  An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee. 'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to

believe that the arrestee has committed or is committing an offense.'

An investigative detention, which is also referred to as a *Terry* stop, is a seizure within the meaning of the Fourth Amendment, but unlike an arrest, it need not be supported by probable cause. '[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause.'  Based on the totality of the circumstances, the detaining officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity'. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual 'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'

*Oliver v Woods,* 209 F.3d. 1179, 1186 (10th Cir. 2000)(citations omitted).

A consensual encounter becomes a seizure within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As stated above, an investigative detention is permissible when an officer has sufficient "particularized and objective" evidence, ie. reasonable suspicion, to believe the person detained has committed a crime.

While there is no litmus-paper test for determining when an investigative detention enters the realm of an arrest, the Tenth Circuit has stated an arrest is distinguished from an investigative detention by the involuntary, highly intrusive nature of the encounter. "[T]he use of firearms, handcuffs, and other forceful techniques," for example, generally indicate an investigative detention has evolved into a *de facto* arrest that must be supported by probable cause. *Cortez v. McCauley,* 478 F.3d 1108, 1115-16 (10th Cir. 2007)(en banc); *Lundstrom v. Romero,* 616 F.3d. 1108, 1120(10th Cir. 2010); *Morris v. Noe* 672 F.3d. 1185, 1192 (10th Cir. 2012). It is clearly established that the use of handcuffs and/or pointing of guns will elevate a *Terry* detention to a *de facto* arrest, except in the limited circumstances where the police have specific information that causes them to reasonably fear for their safety *and* such a measure is reasonably necessary

under the circumstances.  *United States v. Melendez-Garcia*, 28 F.3d. 1046 (10th Cir. 1994); *Gallegos v. City of Colorado Springs*, 114 F.3d. 1024, 1031-32 (10th Cir. 2012); *Morris v. Noe, supra at* 1192.

"[T]he use of handcuffs is greater than a de minimus intrusion and thus requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Lundstrom v. Romero*, *supra*, 616 F.3d. at 1123.  If police officers actions exceed what is reasonably necessary under the totality of the circumstances the stop may only be justified by probable cause or consent. *United States v. Melendez-Garcia*, 28 F.3d. at 1051.  "*The government has the burden* of demonstrating that the seizure 'it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' " *Id. at* 1052 (citations omitted) (emph.. added).

Critically for this motion, as noted above, the *Melendez-Garcia* court emphasized that this determination *must be based on the evidence in the record.  Melendez-Garcia, supra,* 28 F.3d. at 1052-53 (emphasis added).  The Tenth Circuit reiterated this rather basic tenet in *United States v. Matthews,* 458 Fed. Appx. at 722.  This principle was recently recognized by this Court in *United States v Castro,* 929 F.Supp. 2d. 1140, 1148, 1150 (D.N.M. 2013).  *See also, United States v. Turner,* 2013 WL 5727404 *9 (D. Kan.).  Thus, neither the arguments of counsel nor the proffered explanations of counsel are relevant.  The determination must be based solely on the evidence in the record.

In *United States v Melendez-Garcia, supra,* the Court found there had been reasonable suspicion for the initial detention.  The Court then addressed the issue of whether the subsequent handcuffing of the defendant had been lawful:

> ***Once police officers make a stop based on reasonable suspicion, the scope of that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place***.  Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' However, if police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent.
>
> There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; "rather our evaluation is guided by 'common sense and ordinary human experience.' "

***Id. at*** 1051-52 (citations omitted)(emph. added).

The Court ruled that despite the fact that the stop was based on suspicion of trafficking drugs and that drugs, guns and violence often go together, the use of handcuffs was unreasonable because there was no evidence that the police had reason to believe **these particular suspects** had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the ***Terry*** stop.  The Court held that in the absence of such evidence, the naked fact that drugs are suspected does not amount to a ***per se*** justification for use of guns and handcuffs in a ***Terry*** stop.  The Court also looked to the fact that the officers outnumbered the suspects, that the stop occurred on an open highway during the day, that the police had no tips that these suspects were armed or violent, and that the suspects were fully compliant. The Court held that even the fact that the person is a felony drug trafficking suspect is not, by itself, a basis to use such force in an investigative detention.

The ***Melendez-Garcia*** court reviewed Tenth Circuit case law and noted the type of factors where the use of handcuffs had been held appropriate in an investigatory detention. These include observations of threatening and aggressive conduct by the suspect, specific information the suspect is armed at the time of the detention, information demonstrating the suspect is a violent individual or that the suspect was seized for suspicion of a crime involving

the use of violence.   The number of suspects detained compared to the number of officers involved and the time of day are also an important factors.   *See, Melendez-Garcia, supra; United States v. Merritt,* 695 F.2d 1263, 1273-74 (10th Cir.1982), *cert. denied,* 461 U.S. 916 (1983)(police had specific information which suggested that the suspects might be armed, it was late at night in a remote area, and there were only two officers); *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir. 1993) (officers had been informed that the suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck); *United States v. Merkley,* 988 F.2d 1062, 1063-64(10th Cir.1993)(officers were informed the suspect had threatened to kill someone and was acting violently shortly before their arrival and then verified the suspect's violent behavior when he observed him pounding his fists on the steering wheel and shouting at his passenger).[11]

In *United States v. King,* 990 F.2d. 1552, 1563 (10th Cir. 1993), the Court ruled the officer acted unreasonably when she drew her gun and had other officers handcuff the defendant merely because she noticed that the defendant, who was only accused of creating a traffic disturbance by honking his horn, lawfully had a weapon in the car. See also, *U.S. v. Thompson,* 906 F. 2d. 1292, 1296-97 (8th Cir. 1990); *Washington v. Lambert,* 98 F.3d. 1181, 1189 (9th Cir. 1996).

In *U.S. v. Shareff*, 100 F.3d. 1491 (10th Cir. 1996), the Tenth Circuit, noted that the use of handcuffs in an investigative detention raises "serious questions" as to whether a *de facto* arrest has occurred, but held the use of handcuffs (and pointed guns) did not convert that stop

---

[11] While Defendants may argue that Plaintiff was kept in handcuffs for what, to them, was a short time, counsel for Plaintiff has found no cases where the Tenth Circut found the length of time of the handcuffing as a factor in determining whether the act of handcuffing was reasonablSee also in the first instance and in *United States v. Lopez,* 443 F.3d. 1280,1286 (10th Cir. 2006) ruled it was not.   *See also, Martinez v Mares*, 613 F.Appx. 731, 740 (10th Cir. 2015)(unpublished).  However, the length of the handcuffing  and the manner in which it was affected may be relevant to the issue of damages.  Here, Plaintiff was injured by the handcuffing and required surgery to his shoulder.

into a *de facto* arrest because the NCIC printout indicated, incorrectly, that one of the defendants was wanted in another state on a felony charge involving a weapon.  The Court ruled that the officers were justified in keeping defendant Smith who they suspected was a wanted felon in handcuffs while they attempted to investigate his identity because "[i]t is not unreasonable to fear that a wanted felon will attempt to flee, and may jeopardize the safety of officers in such an attempt."  The Court further held that due to the number of suspects, the fact that the encounter took place at night, and the reasonable suspicion that one of the suspects was a wanted felon, the officers were justified in keeping the other defendants in handcuffs for the officers' safety.  However, once the officers learned that Smith was not the individual identified in the NCIC teletype, the continued use of handcuffs constituted an unlawful arrest." *Id*. at 1505-07.

Likewise, ***Gallegos v. City of Colorado Springs, supra,*** provides an example of the circumstances when forceful tactics such as handcuffing are appropriate in an investigative detention.  There, officers arrived on the scene at 1:15a.m. with reasonable suspicion to believe the suspect had committed a crime.  They found the suspect, who weighed 200 lbs. or more, smelling of alcohol and acting in a bizarre manner.  The suspect repeatedly broke away from the officers and, at one point, pivoted toward them, crouched down in a wrestler's position, and was angrily yelling at them.  The Court found that under these circumstances the officer reasonably believed her safety was in danger when she applied an arm bar takedown and that the use of this tactic was appropriate in that investigative detention.  ***supra at 1031.***

Viewed in the light most favorable to Defendants the undisputed evidence in the record demonstrates there is no dispute of material fact regarding the unreasonableness of the manner in which the seizure of Plaintiff was conducted.   Defendants Trujillo and Gallegos received information from the 911 Dispatcher that around 7:45 am on February 21, 2014, that a man in a

grey sweater had been standing in the middle of the street on Railroad Avenue "throwing fingers" at passing cars. The information came to the 911 dispatcher from an anonymous source and Defendants did not know where the information came from. However, the dispatcher did tell them that the reporting party was just passing through the area. They were not told that the man was armed or that he had been arguing with or threatening anyone or that he had used fighting words or that any act of violence had occurred. They knew that "throwing a finger," an expression of disrespect, was not a crime and had no evidence that Plaintiff had committed a crime.

When they arrived at the scene, which was the school bus stop, they saw Plaintiff standing quietly with two children. They got out of their cars. Plaintiff was **not** wearing a grey sweater. They did not know who Plaintiff was. They did no see a weapon and had no evidence that Plaintiff was armed. Plaintiff did not yell at Defendants or try and attack them nor did he try and flee. Defendant Gallegos wanted to talk with Plaintiff and told Plaintiff to come over to his car. Significantly, Defendants had ***no evidence*** that Plaintiff had committed a crime.

According to Defendant Gallegos, at this point it was a consensual encounter and Plaintiff was not required to obey him. According to Defendant, Plaintiff asked: "What's up?" and began to walk toward him as he had been told to do with his hands in his jacket pockets. According to Defendants, Defendant Gallegos twice told Plaintiff to take his hands out of his pockets and when Plaintiff failed to do so, Defendant Gallegos grabbed Plaintiff by his right arm and pulled Plaintiff's hands out of the pockets. Defendant testified that he grabbed Plaintiff by the right arm in order to place handcuffs on him. Defendant Trujillo then "assisted" in the handcuffing of Plaintiff by grabbing Plaintiff's left arm and twisting up behind his back. Plaintiff cried out in pain from the pain he felt in his left shoulder. Defendant Trujillo used

sufficient force to require Plaintiff to seek emergency medical treatment that afternoon and thereafter.

Defendants do not claim that Plaintiff, a slightly built man, disabled with a complete right knee prosthesis from a prior bout with cancer, was handcuffed because they saw what appeared to be a weapon on him or because he had attempted to attack them or because he attempted to flee or because he was belligerent.  Rather, Defendants claim Plaintiff was *handcuffed* because he failed to take his hands out of his pockets after being told to do so.  According to Defendant Gallegos, after Plaintiff was handcuffed he then did a pat down search and then put the handcuffed Plaintiff into the backseat of his police car.

In every case that counsel for Plaintiff had been able to locate, the handcuffing of a person not under arrest was found to be justified only where the officer had *specific* information that the suspect might be armed and/or a serious crime involving violence was under investigation and/or the officer had observed the suspect acting in an aggressive and violent manner.   Moreover, in *all* these cases, the officers had reasonable suspicion to believe the suspect had committed a crime prior to using handcuffs.  Usually, the incident occurred when it was dark out and very often the suspects outnumbered the officers.   It is clear from the case law that in the absence of such limited circumstances, the use of handcuffs elevates the encounter to a de facto arrest requiring probable cause.

Under the totality of the circumstances handcuffing Plaintiff simply because, according to Defendants, he failed to take his hands out of his jacket pockets when told to do so is at odds with clearly established Tenth Circuit law on this issue and does not constitute anything close to the facts that have been found to justify handcuffing during an investigative detention.  To begin with, Defendants had no "particularized, objective" evidence to believe that Plaintiff had

committed a crime. In fact, even the anonymous information they received describing the person allegedly "throwing fingers" at passing cars did not describe Plaintiff as he was not wearing a grey sweater as the person "throwing fingers" was reportedly wearing.   Plaintiff was standing quietly at the bust stop with the two children.  Defendants admit they had no evidence that Plaintiff had committed a crime at the time they told him to walk over to them.  Defendants elevated what they admit was a consensual encounter into a seizure by grabbing Plaintiff and handcuffing him.[12]

The encounter occurred on a public street during daylight.  There were two officers and Plaintiff, a 135 lb. man who is totally disabled.  The incident Defendants were inquiring about not only did not involve a crime of violence, it did not involve a criminal act.  Neither Defendant claimed Plaintiff had tried to attack or fight with them or that they feared him physically.[13] Defendants do not claim they observed Plaintiff committing any crime.  They admit Plaintiff had not argued with or been belligerent toward Defendants before they grabbed him to apply the handcuffs. Defendants had no evidence that Plaintiff had committed a crime.  Defendants had no evidence that Plaintiff was armed.   Based on their version of the facts, it appears they thought that there could possibly be a weapon in Plaintiff's jacket pocket but had not seen anything they thought looked like one.[14]

---

[12] Obviously, a citizen placed in handcuffs by the police is not free to leave.  Moreover, as explained above, the use of handcuffs, will, in the absence of limited circumstances, not of which were present here, will convert an instigative detention into a de facto arrest requiring probable cause.

[13] Defendants claim Plaintiff tried to move away from them **after** Defendant Gallegos grabbed Plaintiff by his right arm to handcuff him.  While this is a disputed fact because Plaintiff denies this occurred, it is undisputed that, that under Defendants version of the facts Defendant Gallegos had grabbed Plaintiff's arm to apply the handcuffs **before** Plaintiff allegedly tried to "move away" from Defendant's hold.   While Defendants' version may create a dispute of material fact regarding the excessiveness of the force they use, it does not create a material fact on the issue of whether it was reasonable to handcuff Plaintiff in the first instance as Defendants admit they grabbed Plaintiff to handcuff before he allegedly "pulled away" from their effort.

[14]At the most, Defendants might have had a basis to conduct a pat down frisk **before** grabbing Plaintiff to handcuff

In this case, there is no testimony in the record that would justify the handcuffing of Plaintiff even if Defendants had possessed reasonable suspicion to believe Plaintiff had committed a crime.  It is undisputed that Plaintiff did not physically resist the officers, nor do they present any evidence that the Plaintiff was disruptive to the extent that handcuffing him was necessary. There are no facts suggesting there was a need to resort to handcuffing Plaintiff in order to protect the officers' personal safety and no facts suggesting that Plaintiff was resisting compliance to a degree that required handcuffing Plaintiff to maintain the status quo.  *See, e.g.* *Martinez v. Mares,* 14-cv-00041 WJ-KBM *Doc. 48* at 13, 16. (Memo. Op. and Order granting plaintiff partial summary judgment  8/27/14).

The Tenth Circuit has **never** upheld the use of handcuffs as reasonable in a situation where, as here, the police outnumbered the individual detained, the detention occurred in broad daylight, the police had no evidence the individual detained had committed a crime, the police had not received a tip that the individual was armed, the police saw no weapon, and the person detained did not physically resist the officers or attempt to flee prior to the effort to handcuff him. In light of *Melendez-Garcia, supra*, *United States v. King*, *supra*, *United States v. Shareff*,

---

him.  However, they did not attempt to do so prior to grabbing Plaintiff by the arms to handcuff him.   Moreover, even a pat-down search would likely have been unlawful under the totality of the circumstances present because not only had Defendants not received information that the person "throwing fingers" had a weapon and had not seen anything that looked like a weapon when they arrived, Defendants lacked reasonable suspicion to believe Plaintiff had committed a crime at the time.   A pat-down search is justified only where an officer is engaged in a lawful investigative detention **and**   "'…is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.' …'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence....'" *Minnesota v Dickerson,* 508 U.S. 366, 373 (1993)(citations omitted).  In the instant case, Defendants had no evidence Plaintiff had committed a crime. Additionally, the information about a "finger thrower" came from an anonymous source and such information will rarely provided reasonable suspicion for an investigative detention and the circumstances where it will provide reasonable suspicion are where the anonymous information includes " predictive " information about the suspect. *Florida v J.L.* 529 U.S. 266(, 270-272 2000).  The information relayed to Defendants not only failed to contain predictive behavior but identified the "finger thrower" as a man wearing a grey sweater and Plaintiff was not wearing such clothing.

*supra*, **Gallegos**, *supra*, and **Lundstrom, supra**, no reasonable officer would have believed it was necessary to forcibly handcuff Plaintiff under the circumstances present and Defendants conduct violated Plaintiff's clearly established Fourth Amendment rights.

The cases in the Tenth Circuit cited above clearly established that the use of handcuffs under the facts present on February 21, 2014, elevated the seizure to a de facto arrest requiring probable cause and no reasonably trained police officer would have believed otherwise. Because there is no evidence from which the trier of fact could reasonably conclude that forcible handcuffing of Plaintiff was objectively reasonable and because the law was clearly established, Plaintiff is entitled to summary judgment on that issue.

**V.  The Continuing Detention Of Plaintiff Inside a Police Unit While In Handcuffs Violated Plaintiff's Clearly Established Fourth Amendment Rights.**

While Plaintiff contends that Defendants had no lawful right to handcuff him on February 21, 2014, he further contends that even if they had had such a right, they violated his Fourth Amendment right to be free from unreasonable seizures of his person when they continued to kept him in handcuffs inside a police unit after they knew he had no weapon.  According to Defendant Gallegos, Defendants put Plaintiff inside his police unit, in handcuffs, after Defendant had conducted a pat down search where no weapon was found.  Defendants would not allow Plaintiff to remain in the bus stop area, told Plaintiff that he had to stay away from the bus stop area and transported Plaintiff to his house where the handcuffs were eventually removed.

By February 21, 2014, the law was clearly established that even where a police officer initially has reasonable suspicion to conduct an investigative detention of a citizen ("***Terry Stop***"), once that suspicion has been dispelled, the citizen must be allowed to leave ***without delay***. *United States v McSwain,* 29 F.3d. 558 (10th Cir. 1994); *United States v Lambert,* 46 F.3d. 1064, 1069, n.3 (10th Cir. 1995); *United States v Lopez, supra,* 443 F.3d. 1280; *United*

*States v Pena-Montes*, 589 F3d. 1048,1054(10ᵗʰ Cir. 2009).

In ***McSwain, supra,*** the officer had stopped McSwain for the purpose of ensuring the validity of the temporary registration sticker on his vehicle but continued to detain and question him after ascertaining the sticker was valid, eventually finding crack cocaine in his possession. This Court held the continued detention unreasonable.  Once the officer learned the sticker was valid "the purpose of the stop was satisfied" and the officer's "further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification" and violated the Fourth Amendment.  ***McSwain, supra,*** 29 F.3d. at 561 and 562.[15]

Likewise in ***Lopez, supra,*** the officer testified he approached Lopez because it was late at night.  Lopez was standing in a high crime area and the officer suspected Lopez may have stolen a car he was standing next to.  He took Lopez driver's license and ascertained that the address of the license matched the address of the registered owner of the car.  Nevertheless, the officer then took Lopez's license to his car, ran a warrant check, and learned there was a misdemeanor arrest warrant outstanding for Lopez.   Lopez was arrested and searched and drugs and ammunition were found.  This Court held the continuing detention was an unreasonable seizure: "Within seconds of reviewing Lopez's license, Jackson was able to establish Lopez's identity and confirm Lopez's address matched the address on the car registration. ***After that point***, the continued retention of Lopez's license was undue." ***Lopez, supra,*** 443 F.3d. at 1285 (emph. added).  The Court rejected the government's contention that the brevity of the detention should

---

[15]  In ***Robinson v City of San Diego,*** 954 F.Supp.2d 1010, 1021 (S.D. Cal. 2013), the court, relying in substantial part on ***United States v McSwain, supra,*** granted plaintiffs' summary judgment on their claim that defendants' continued detention of them during March 2010, after the reasonable suspicion for the initial detention had dissipated violated their Fourth Amendment rights.  The court held that where it was undisputed that after defendants realized they had made a mistake in stopping plaintiffs' vehicle but continued the detention to inquire into plaintiffs' identification, registration and insurance information, defendants actions violated the plaintiffs Fourth Amendment right to be free from unreasonable seizure "and that these rights were clearly established at the time of the conduct at issue."

cause a different result, holding that the detention became unreasonable as soon as reasonable suspicion dissipated *and the fact that the officer retained Lopez' license for only a few minutes was immaterial*. *Id. at* 1286 (emphasis added). *See also, United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) (once reasonable suspicion has been dispelled,'[e]ven a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment").

In *Pena-Morales, supra,* the officer detained the defendant because he suspected the car the defendant was a passenger in lacked a valid license plate and might be stolen.  After seeing the car had a valid plate, the officer continued to detain, question and pat-down the driver and defendant, eventually arresting the defendant. This Court held that, like the trooper in *McSwain*, the investigation was complete when officer saw that the vehicle actually had a plate—before he began questioning the vehicle's occupants.  The *Pena-Morales* Court rejected the government's contention that *McSwain* was distinguishable because, in that case the trooper only suspected a traffic violation, not that the car was stolen. *But, the subject of Hernandez's actual suspicion is of no moment;* the question is whether the information known to the officer supported some objectively reasonable suspicion of criminal activity." *Pena-Morales, supra,* 589 F.3d. at 1055 f.n 4 (emph. added).

Recently, the Tenth Circuit again addressed this issue in *Martinez v Mares*, 613 F.Appx. 731, 740 (10th Cir. 2015)(unpublished), a case arising out of a 2012 incident which, inter alia, involved an issue about the continued detention of the plaintiff in handcuffs after the defendant officers learned that the person they had handcuffed was not the person they had thought he was. The Court held that: "…once those circumstances justifying the detention had been dispelled, the law was also clearly established that a law enforcement officer cannot continue to detain an

individual, even if only for a few minutes." (citations omitted).[16]

In *U.S. v. Shareff*, *supra,* 100 F.3d. 1507, the Tenth Circuit clearly held that even where the handcuffing of a suspect is initially justified, once officers know the individual is not armed and the situation is secured, the continued use of handcuffs constitutes an unlawful de facto arrest.

In this case, Defendants claim Plaintiff was handcuffed because after he complied with their request to come over to their cars, he failed to take his hands out of his jacket pockets when they told him to do so.  Despite the fact that Defendants were not told the unidentified "finger thrower" was armed and did not see any evidence of a weapon, presumably they speculated there could have been a weapon in his pockets and thought they could handcuff Plaintiff and then see if he had a weapon. It is undisputed that Plaintiff was kept in handcuffs and placed into a police unit and then transported to another location *after* the time Defendant Gallegos stated he did a pat down search of Plaintiff, a search which yielded no weapons.

Defendants admit they had no evidence Plaintiff had committed a crime at the time they arrived and do not claim they obtained evidence that he had done so prior to handcuffing him. Additionally, there is no evidence Plaintiff posed any threat to Defendants.  Once a pat down search was done, they knew Plaintiff had no weapon and their preferred justification for handcuffing him had dissipated.  Defendants had a legal duty to release Plaintiff or, at minimum, to take the handcuffs off and no reasonably well trained officer could have believed otherwise. *U.S. v. Shareff*, 100 F.3d. at 1507. Under well-established Tenth Circuit law, there was no

---

[16] *Martinez v Mares, supra,* involved the Tenth Circuit's affirmance of The Honorable William Johnson's denial of the defendants' Motion for Summary Judgment on the grounds of qualified immunity.  In a separate opinion, Judge Johnson granted plaintiff summary judgment on the issue of his continued detention after the time any alleged reasonable suspicion for the detention had dissipated.  *Martinez v Mares,* 14-cv-00041 WJ-KBM *Doc. 48* (Memo. Op. and Order granting partial summary judgment 8/27/14).

lawful justification for keeping Plaintiff inside a police car in handcuffs after the pat down and Defendants' conduct violated Plaintiff's clearly established Fourth Amendment rights.

**VI. Conclusion.**

For the reasons set forth above, because there are no material facts in dispute, Plaintiff is entitled to summary judgment on his claim that he was subjected to an unreasonable seizure in violation of his clearly established Fourth Amendment rights when Defendants used handcuffs to seize him on February 21, 2014.  Secondly, even if there had been a lawful justification to use handcuffs to seize Plaintiff, the undisputed facts show that Defendants' violated Plaintiff's clearly established Fourth Amendment rights by continuing to detain him, in handcuffs, inside a police unit after they knew he had no weapons on him.

S/Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, NM 87501
505-988-5324 Fax: (505-989-4844)
richard.rosenstock@gmail.com

Attorney for Plaintiff

CERTIFICATE OF SERVICE OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I hereby certify that I caused a copy of this Motion to be electronically served on all counsel of record at their respective email addresses as registered on CM/ECF on the date of filing hereof.

s/Richard Rosenstock
Richard Rosenstock