# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GEORGE GALLEGOS,

Plaintiff,

vs

                              No. 1:15-CV-00638 RB/KK

RICHARD TRUJILLO and JASON
GALLEGOS, in their
individual capacities, and
THE CITY OF ESPANOLA,

Defendants.

**DEPOSITION OF JASON GALLEGOS**
**November 30, 2015**

                16
1 Q. And what is that?
2 A. It's a report generated after an incident.
3 Q. And does it state when the date of the incident
4 was?
5 A. Yes.
6 Q. What does it say there?
7 A. Date reported March 31st, 2014.
8 Q. But what's the date of the incident?
9 A. The occurrence date is February 21st, 2014.

24 Q. You didn't do a police report at the time
25 shortly after the incident?

              17
1 A. No.
              18
3 Q. Did you know who George Gallegos was before
4 that date?
5 A. Before the date of the incident?
6 Q. Yeah.
7 A. No.
8 Q. Had you ever heard about him, anything about
9 him?
10 A. No. Prior to, no.

11 Q. So when you encountered him on the street that
12 day, he was a complete stranger to you?
13 A. Correct

17 Q. And who -- do you know who reported seeing
18 this?
19 A. I do not.
20 Q. Do you have any information as to when that
21 person claimed to have seen this?
22 A. I do not.

                    22
10 Q. You wrote that on February 21st, 2014, at about
11 somewhere between 7:00 and 9:00 in the morning, you were
12 "dispatched to Railroad Avenue in front of the Head
13 Start building to make contact with a male individual
14 who was seen acting disorderly on the side of the road."
15 That's what you wrote?
16 A. Correct.
17 Q. And who -- do you know who reported seeing
18 this?
19 A. I do not.
20 Q. Do you have any information as to when that
21 person claimed to have seen this?
22 A. I do not.
23 Q. But you wrote that "The disorderly acts that
24 the individual was seen eng
aging in were standing in
25 front of passing vehicle"?

                    23
1 A. Correct.
2 Q. "Flipping off passing vehicles"?
3 A. Correct.
4 Q. And "throwing rocks at passing vehicles"?
5 A. Correct.
6 Q. When you wrote "standing in front of passing
7 vehicles," what does that mean? What do you mean by
8 that?
9 A. That's what was dispatched to us for the
10 complaint, the information that was relayed to us over
11 the radio through our dispatch center. That's what was
12 dispatched to us.
13 Q. So you're saying you got this information from
14 the dispatcher?
15 A. Yes. Whoever called, whoever made the call to

                    2

16 dispatch, described these actions to dispatch, and that
17 was what was relayed to us.

           24

6 Q. And you weren't told who the source of the
7 information was or how they might have known?
8 A. No.
9 Q. So as far as you knew, it was an
10 anonymous -- you didn't know whether it was anonymous or
11 not?
12 A. It could have been anonymous passer-byers,
13 people that resided on Railroad Avenue.
14 Q. Were you told of any witnesses that you might
15 interview?
16 A. No.

           25

11 Q. And then you wrote that "The male individual
12 was later identified as George R. Gallegos"?
13 A. Correct.
14 Q. When was he identified as George Gallegos?
15 A. After I made contact with him.

           27

17 As he was walking to me, I kept telling him
18 to take his hands out of his pockets. He got within an
19 arm's length of me, still his hands in his pockets. At
20 that point is when I grabbed his right forearm area and
21 pulled his hands out of his pockets. He tensed up and
22 kind of pulled away from me. That's when I got him into
23 a C-clamp escort hold and tried to put him facedown on
24 my unit -- on the hood of my unit.

           28

13 Q. Now, in fact, once you had Mr. Gallegos
14 handcuffed and in the police car is when you asked him
15 his name, correct?
16 A. I don't know at exactly what point I asked him
17 for his name.

22 Q. You wrote that "Numerous calls to Espanola
23 dispatch were received on Mr. Gallegos's actions"?
24 A. Correct.
25 Q. His actions that morning?

           29

1 A. No, the previous day's are the same actions.

           3

2 Q. Was he named in those dispatch calls?
3 A. Named as -- identified by -- described to us,
4 no, the same description.
5 Q. And what were the actions?
6 A. The same actions.
7 Q. Throwing rocks at cars?
8 A. Flipping cars off and throwing rocks at cars.
9 Q. And when you say "numerous," over the prior
10 three months before this, how many calls were there?
11 A. This had started about a week prior to. Every
12 morning, we'd come out around the same time, we'd get
13 the same call.
14 Q. Who would you get the call from?
15 A. Dispatch.
16 Q. Isn't there a dispatch log, reports that are
17 made on the calls that come in?
18 A. There should be.

     30
7 from the 911 Dispatch Center in Espanola for February
8 21st, 2014. Do you see that?
9 A. Yes.
10 Q. And do you see at approximately midway down,
11 there's an entry that says -- who's "KCALVERT"?
12 A. That's whoever the dispatcher is, operator, I'm
13 assuming.
14 Q. And it says, "Male wearing a gray sweater with
15 a hood on// Throwing fingers at vehicles as they passed
16 by// Male is in the middle of the roadway in front of
17 the Head Start." Do you see that?
18 A. Yes.
19 Q. There's nothing about this person throwing
20 rocks reported, is there?
21 A. This page, no.
     31
11 Q. And it says the man was reported to be in the
12 middle of the roadway in front of the Head Start. It
13 doesn't say he was standing in front of passing
14 vehicles, does it?
15 A. No

23 Q. And the first call was to you, correct? You
24 were the one who was dispatched there initially?
25 A. Yes

                    32
5 Q. Okay. Let me play for you the dispatch call.
6 Let's start this again. Let's start this again now that
7 I've got the speaker working.
8 (Audio playing.)
9 Q. (By Mr. Rosenstock) Okay. Now, you heard that
10 the caller told the dispatcher that the individual was
11 wearing a gray sweater with a pullover -- a pullover
12 with a hood on, correct?
13 A. Right.
14 Q. He wasn't reported wearing a blue jean jacket,
15 was he?
16 A. No.
17 Q. And he wasn't reported throwing rocks, was he?
18 A. No, flipping off cars.
19 Q. And he wasn't reported standing in front of the
20 cars, was he?
21 A. No.
                    33
13 Q. (By Mr. Rosenstock) Did you hear that, the
14 dispatcher goes, "Espanola 21"?
15 A. Correct.
16 Q. Who is Espanola 21? That was you, wasn't it?
17 A. Yes, I believe so. Hang on. Let me confirm
18 that.
19 Q. If you look at the second page, I think it has
20 the unit numbers.
21 A. Yes.
22 Q. Okay. So that was a call to you, correct?
23 A. Correct.
24 (Audio playing.)
25 Q. (By Mr. Rosenstock) Do you hear her say that
                    34
1 he's standing in the middle of the road in a gray
2 sweater and he's throwing fingers at vehicles as they
3 pass by?
4 A. Okay. Say that again.
5 Q. Did you hear her say that he's standing in the
6 middle of the road in a gray sweater and he's throwing
7 fingers at vehicles as they pass by?
8 A. Yes.
                    36
9 (Audio playing.)
10 Q. (By Mr. Rosenstock) Who's that?

                    5

11 A. That was me.
12 Q. So the dispatcher told you that the caller had
13 advised he was standing in the middle of the road; she
14 was just passing by the area and is out of the area,
15 correct?
16 A. Correct.
17 Q. So you knew that the source of the caller was
18 no longer in the area?
19 A. Correct.

37

16 Q. The only information you were given is that he
17 was throwing fingers at vehicles as they passed by,
18 correct?
19 A. Correct.
**20 (Audio playing.)**
21 Q. (By Mr. Rosenstock) Now, did you learn that
22 the dispatcher did call the YDI as you asked?
23 A. I don't recall if they did or didn't.
24 Q. So in fact, on February 21st, 2014, there was
25 no report given to you of an individual throwing rocks

38

1 at passing vehicles, correct?
2 A. Correct.
3 Q. And there was no report of any kind of weapon
4 being involved, was there?
5 A. Correct.
6 Q. There was no report of any argument going on,
7 was there?
8 A. Correct.
9 Q. There was no report of this individual yelling
10 or screaming, was there?
11 A. No.
12 Q. There was no report of this individual using
13 fighting words towards anybody, was there?
14 A. Fighting words, no.

39

16 Q. Is it a crime to give somebody the middle
17 finger?
18 A. No.
19 Q. And you weren't even told that the caller had
20 claimed that this individual had given -- thrown a
21 finger at her, correct?
22 A. I don't recall the fingers were being thrown.

23 I don't know if she saw him flipping a finger at
24 somebody else or he threw fingers at her.

                    40
9 Q. But you had no information that there was any
10 threat of immediate breach of the peace when you arrived
11 on the scene, did you?
12 A. What do you mean by that?
13 Q. Well, that a fight was about to break out when
14 you arrived.
15 A. No.

                    42
22 Q. (By Mr. Rosenstock) Okay. Exhibit 3 is a
23 document from the Espanola Rio Arriba E-911 Center,
24 correct?
25 A. Yes, sir.
                    43
1 Q. And it says on it, "CAD logs three months prior
2 to February 21st, 2014 reference a male subject on
3 Railroad Avenue," correct?
4 A. Yes.

8 Q. And if you look at the next three, four pages,
9 it contains the calls that are responsive to this
10 request. All calls reference a male subject on Railroad
11 Avenue for the three months prior to February 21st,
12 2014. And do you see there's a call on February 12th,
13 2014?
14 A. Yes.
15 Q. It reports that somebody wearing a flannel
16 jacket was cursing at passing cars, correct?
17 A. Yes.
18 Q. That was over by the Head Start on Railroad
19 Avenue, correct?
20 A. It doesn't say.
21 Q. If you look below where it says, "Male subject
22 wearing" --
23 A. Yes, it's on Railroad, yes.
24 Q. Okay. And then it indicates that -- No. 21,
25 that would have been you, correct?

                    44
1 A. If I hadn't changed, it should have been, yes.
2 Q. You didn't find anybody matching that
3 description there, and you will double back and check

4 the streets again, but this individual wasn't located.
5 Is that what it indicates on the 12th of February?
6 A. Yes.
7 Q. Do you see any other calls on the 12th of
8 February other than this one?
9 A. No.
10 Q. Okay. And then the next entry is on January
11 10th, 2014, correct?
12 A. Correct.
13 Q. And the report there is that somebody is -- a
14 male was across the street from the PW Building on
15 Railroad Avenue yelling at vehicles, correct?
16 A. Correct.
17 Q. This is the totality of what I was given by the
18 911 people.
19 A. Okay.
20 Q. There is nothing here about anybody -- this
21 individual throwing rocks, is there?
22 A. In these documents, no.

47

23 Q. Now, wrote in your report that Officer Trujillo
24 assisted you on the incident and arrived at the scene
25 with you in his own patrol unit?

48

1 A. Yes.
2 Q. Did he arrive approximately the same time you
3 did?
4 A. Approximately.
5 Q. You said the two of you had been eating
6 breakfast?
7 A. Yes, sir.

13 Q. And you wrote that upon your arrival, you
14 witnessed Mr. Gallegos standing on the east side of
15 Railroad Avenue wearing a blue jean jacket, correct?
16 A. Correct.
17 Q. And he wasn't a wearing a gray sweater, was he?
18 A. No.
19 Q. So he didn't match the description that you
20 were given, did he?
21 A. I guess no.

25 Q. And he was just standing there, correct?

                    49
1 A. Correct.
2 Q. He wasn't doing anything in particular at that
3 time, was he?
4 A. At the time we arrived, no.
5 Q. And you wrote that you exited your unit and you
6 called Mr. Gallegos to your unit, correct?
7 A. Correct.
8 Q. At that point, you didn't know he was
9 Mr. Gallegos, right?
10 A. No.

21 Q. So you told him to come over to your unit. At
22 that point, did you think you had the right to arrest
23 him?
24 A. No.
25 Q. At that point, you didn't have **any** evidence he

                    50
1. had committed a crime, did you?
2 A. No.
3 Q. You just wanted to talk to him?
4 A. Correct.
5 Q. So at what -- at that point, you were involved
6 in what would be called a consensual encounter, in your
7 opinion?
8 A. Correct.
9 Q. And he responded by saying, "What's up?" and
10 tilting his head back, you wrote, correct?
11 A. Correct.
12 Q. Now, was he required to obey your command to
13 come over to your unit?
14 A. No.
15 Q. Because he wasn't doing anything wrong, was he?
16 A. At the time of my arrival, no.

                    51
7 you parked from him when you told him to come over to
8 your vehicle?
9 A. I don't recall feet or yards or anything.
10 Q. Well, it was close, wasn't it?
11 A. Close enough for him to hear me.

                    52
5 Q. (By Mr. Rosenstock) You pulled up into the
6 area where Mr. Gallegos was standing to the south of

                    9

7 him, correct?
8 A. South of where he was standing.
9 Q. Correct. And how many feet south of him were
10 you?
11 A. I didn't get a measuring tape. I wouldn't
12 know.
13 Q. Well, more or less?
14 A. I have no idea.

53
20 Q. So this is a February morning. It's cold,
21 isn't it?
22 A. From what I recall.
23 Q. And so he asks you, "What's up?" And you say
24 he has his hands inside his jacket pockets?
25 A. Uh-huh (yes).

54
15 Q. So you're saying he was not required to respond
16 to you and walk over to where you were; he didn't have
17 to do that?
18 A. No.
19 Q. Why did he have to take his hands out of his
20 pockets, then?
21 A. Because he was going to approach me and ask to
22 come talk to me. He started to walk towards me. I
23 didn't know what he had in his pockets. I didn't know
24 if he had anything in his pockets.

55
7 Q. You suspected he might have been the person who
8 was throwing fingers?
9 A. Correct.
10 Q. But you're saying he wasn't obligated to walk
11 towards you?
12 A. No, but he did.

56
12 Q. (By Mr. Rosenstock) Now, when you arrived, you
13 didn't see this individual doing anything that was
14 suspicious, did you; he was just standing there?
15 A. Again, correct

57
13 Q. (By Mr. Rosenstock) Have you been trained
14 about what effect an anonymous tip provides as a basis

10

15 for probable cause?
16 A. No.
17 Q. Have you received any training on what effect
18 an anonymous tip has as a basis for reasonable
19 suspicion?
20 A. I believe so.
21 Q. What have you been told -- trained?
22 A. It's been a long time.
23 Q. You can't recall your training?
24 A. I can't recall at this point, no.

59

6 Q. In this case, the only information you had was
7 the person was engaged in throwing fingers, correct?
8 A. Correct.
9 Q. And you've already said that was not a crime,
10 correct?
11 A. Correct

17 Q. (By Mr. Rosenstock) According to Officer
18 Trujillo, you told Mr. Gallegos to take his hands out of
19 his pockets, and that he refused to do so but he
20 continued to walk towards you; is that correct? Is that
21 what happened?
22 A. Yes
23 Q. And he writes, "At that time Officer Gallegos
24 then approached Mr. Gallegos and attempted to place him
25 in hand restraints for our safety"; is that correct?

60

1 A. Correct.
2 Q. And he writes that "Mr. Gallegos pulled away
3 from Officer Gallegos" and he assisted -- Trujillo
4 assisted you; is that correct?
5 A. Pulled away from him in an angry manner -- yes.
6 Q. And then turning to your report, your incident
7 narrative, the last sentence in your report, you wrote,
8 "Mr. Gallegos was placed in handcuffs for refusing to
9 take his hands out of his pockets" and approaching you,
10 correct? That's what you wrote?
11 A. Correct.
12 Q. And that's your testimony why he was placed in
13 handcuffs?
14 A. Yes.
15 Q. And in fact, in terms of approaching you, you
16 had asked him to approach you, correct? You had asked

17 him to come over, according to you?
18 A. Correct.
21 Q. Now, you didn't have any report from the
22 dispatcher that the individual out there on Railroad
23 Avenue had a weapon, right?
24 A. No.
25 Q. And you didn't get a report from the dispatcher

61

1 of violent conduct, did you, fighting or anything of
2 that nature?
3 A. Fighting, no.
4 Q. No act of violence was being committed, was it,
5 reported to you?
6 MR. DWYER: I believe he already answered
7 that question a couple of times. And I know there was
8 some discussion of what an act of violence is.
9 Q. (By Mr. Rosenstock) Go ahead, you can answer
10 it.
11 A. No.
12 Q. And you didn't see a weapon on Mr. Gallegos,
13 did you?
14 A. No.
15 Q. And when you arrived and he was standing there,
16 he was quiet at that time, wasn't he?
17 A. I believe so.
18 Q. And he didn't try to attack either you or
19 Officer Trujillo prior to you taking his arm, correct?
20 A. No.
21 Q. And he didn't try to run away from you or run
22 away from the scene prior to the time you took his arm,
23 correct?
24 A. Right.
25 Q. You said earlier that you had put his – put

62

1 him in a C-clamp hold?
2 A. Yes, sir.
3 Q. Could you tell me what that is.
4 A. That's what we were taught in the academy. My
5 left hand goes near his elbow area, my right hand gets
6 his hand kind of in a C-clamp to keep him away from
7 whatever he may or may not have at the time. And that
8 is to gain control.
9 Q. It's a pain compliance technique, isn't it?
10 A. I don't recall it's a pain compliance. I was

12

11 advised it was an escort hold.
12 Q. And you and Trujillo both at some point took
13 Mr. Gallegos's arms and had them behind his back,
14 correct?
15 A. Correct.
16 Q. And they were -- Trujillo was twisting his left
17 arm up and you had his right arm, correct?
18 A. Correct.
19 Q. And Mr. Gallegos in fact was yelling out,
20 wasn't he, that he was in pain?
21 A. I don't recall.

63

1 Q. And he was facing towards the unit when you had
2 his hands behind his back before you cuffed him,
3 correct?
4 A. Correct.
5 Q. And he actually -- his head was down on the
6 unit, wasn't it?
7 A. I don't recall if his head was on the unit.
8 Q. Or not, you don't remember?
9 A. I don't know.
10 Q. Now, after Mr. Gallegos was handcuffed, he was
11 placed in one of the two police units, wasn't he?
12 A. Correct.

64

4 Q. Well, at some point, you closed the door,
5 didn't you?
6 A. After I asked him where he lived and he
7 described to us where he lived, I asked him if he wanted
8 a ride over there. He agreed, and I advised him that if
9 he's going to be in the back seat of my police unit, he
10 needs to remain in cuffs.
11 Q. Mr. Gallegos lived three houses away from the
12 bus stop, didn't he?
13 A. Correct.
14 Q. You're saying he asked you if you would give
15 him a ride handcuffed in the back of the police car?
16 A. I asked him where he lived and asked him if he
17 wanted a ride to his house so we could continue talking
18 over there instead of where we were at.
19 Q. Well, you're saying that everyone had already
20 left?
21 A. Yes.
22 Q. So why didn't you just release him from the

23 handcuffs?
24 A. He lived down the road, and we would talk at
25 his house.

65

21 Q. Well, why wasn't he just released from the
22 handcuffs once everybody left and the children weren't
23 there?
24 A. We were still wanting to talk to him and get
25 to -- clarify everything that had been going on.

69

1 who you said was wearing a blue jean jacket,
2 had -- well, you had no evidence he'd committed a crime,
3 correct?
4 A. Correct.
5 Q. But you felt you had the authority to order him
6 away from someplace?
7 A. Correct.
8 Q. And when would he be allowed to go back to that
9 place under that command?
10 A. I didn't tell him how long he could go back.
11 Q. So could it have been a week, or month, or
12 never?
13 A. It could have been.

70

5 Q. So he was being told that he had to leave the
6 bus stop area, correct?
7 A. Correct.
8 Q. And yet he was left with the impression that
9 this could be indefinite, correct?
10 A. It may have been.

71

16 Q. Now, did you receive training on the use of
17 your -- there was a radio in your car, wasn't there?
18 A. Correct.
19 Q. And it worked, didn't it?
20 A. Correct.
21 Q. Did you receive training regarding the use of
22 the radio?
23 A. Training, no, just pick up and use it.
24 Q. But weren't you told that when you arrive at
25 the scene of a call, you should call in to say you've

72

1 arrived?
2 A. Correct
3 Q. And then weren't you told to radio in when you
4 leave the scene of an incident?
5 A. Correct.
6 Q. Were you told that when you get out of your
7 police unit, you should radio in?
8 A. Correct.
9 Q. Were you told that when a person is placed in
10 your police unit, you should radio that in?
11 A. Correct.
12 Q. And let me -- looking at the CAD report,
13 Exhibit 2, you didn't tell the dispatcher that
14 Mr. Gallegos been handcuffed, did you?
15 A. No.
16 Q. You didn't report that Mr. Gallegos had been
17 placed in a police unit while handcuffed, did you?
18 A. No.
19 Q. And you didn't tell the dispatcher that you
20 were transporting Mr. Gallegos because he had asked to
21 be transported, did you?
22 A. No. He wasn't -- he didn't ask me to be
23 transported. I told him that once -- I asked him if he
24 wanted a ride to his house.
25 Q. But you didn't report that to the –

73

1 A. No.
2 Q. And what if he said he didn't want a ride to
3 his house? You weren't going to leave him at the bus
4 stop area, were you, because he'd been told to leave the
5 area?
6 A. Correct.
7 Q. So he was going to have to leave the bus stop
8 area one way or the other, correct?
9 A. Correct.

17 Q. (By Mr. Rosenstock) Now, Mr. Gallegos wasn't
18 uncuffed until you got to his house; is that correct?
19 A. Correct.

74

2 Q. And in terms of you and Trujillo, who was the
3 senior officer?
4 A. Trujillo

15

9 Q. You were a probationary officer at the time?
10 A. I believe so. Let's see -- I started October
11 of 2013 and this happened in -- yes.

                          76
20 Q. Now, it was Trujillo who had his left
21 arm -- Mr. Gallegos's left arm behind his back, correct?
22 A. Correct.
23 Q. Do you know whether Trujillo -- I guess you
24 weren't really paying attention to what Trujillo was
25 doing with the left arm because you were trying to get
                          77
1 his right arm in there and handcuff him, correct?
2 A. Correct.

18 Q. In the course of your report, he was handcuffed
19 because -- he was handcuffed for refusing to take his
20 hands out of his pockets and approaching you?
21 A. While approaching me, correct.

                          80
15 Q. And wasn't -- at the time Mr. Gallegos was
16 placed in handcuffs, wasn't he yelling in pain?
17 A. I don't recall.
18 Q. And wasn't Officer Trujillo yelling at
19 Mr. Gallegos at some point during the handcuffing?
20 A. I don't recall

                          87
2 Q. Did you -- did anybody ever mention to you
3 specifically responding to prior calls there that we
4 could look up in that dispatch system?
5 A. I can't remember what officer did advise me
6 that they knew who Mr. Gallegos was and that they had
7 been to similar calls.
8 Q. Was this before or after the incident?
9 A. After.
10 Q. Who was that officer?
11 A. I can't remember right now.

                          90
10 Q. I just have couple of follow-ups on that.
11 Officer Gallegos, you may have answered
12 this, I may have asked it, but prior to the time that
13 you asked Mr. Gallegos to come over to -- toward you,
14 you have no evidence that he had a weapon at that point,

15 correct?
16 A. No.

17