# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GEORGE GALLEGOS,

Plaintiff,

vs.                               No. 1:15-CV-00638 RB/KK

RICHARD TRUJILLO and JASON
GALLEGOS, in their
individual capacities, and
THE CITY OF ESPANOLA,

Defendants.

**DEPOSITION OF RICHARD TRUJILLO**
**December 24, 2015**

         50
2 Q. And then it has George Gallegos's name there.
3 Did you know George Gallegos before February 21st, 2014?
4 A. Nope.
5 Q. Had you ever heard of who he was before?
6 A. Nope.
7 Q. So you -- when you first got to the scene, you
8 didn't even know who this person was, correct?
9 A. Correct.

         51
15 Q. And you said earlier that everything in this
16 case supplement is true and correct?
17 A. Correct, off of what I did.
18 Q. And that there were no facts missing that were
19 important, correct? All the important facts are in
20 here?
21 A. They should be.
22 Q. Well, are they?
23 A. They should be.
24 Q. Do A. They should be.
25 Q. Do you want to read it again and make sure of
 that?

         52
1 A. No, there's no need to read it.

2 Q. Can you think of anything significant that you
3 didn't put in there?
4 A. Not that I can recall

                53

2 Q. And do you know who the person -- who the
3 source of this information was?
4 A. No.
5 Q. And how did you get this information?
6 A. Through dispatch.
7 Q. And this is what you claim dispatch is -- what
8 you wrote dispatch told you?
9 A. Dispatch gave us a call of a male individual
10 flipping off cars and throwing rocks at passing cars.
11 Q. That's not what you were told, was it?
12 A. Excuse me?
13 Q. You were not told anything about the individual
14 throwing rocks, were you?
15 A. Yes, we were. That's what the call was.
16 Q. You wrote, "We've had numerous calls of a male
17 individual doing the same things to vehicles as they
18 passed prior to this call"?
19 A. Correct.
20 Q. So these numerous calls, how many were there?
21 A. No idea.
22 Q. Approximately?
23 A. No idea.

                54

6 Q. What does "numerous" mean?
7 A. A number of them. More than one.
8 Q. More than one. Possibly two?
9 A. No idea

                56

8 Q. (By Mr. Rosenstock) Do you want to listen to
9 the dispatch tape?
10 A. We could listen to it, but that's what I
11 remember.
**12 (Audio playing.)**
13 Q. (By Mr. Rosenstock) You heard that -- a woman
14 call in to dispatch saying that there was a man who was
15 flipping off cars on Railroad Avenue wearing a gray
16 hooded sweater?
17 A. Correct.

**24 (Audio playing.)**
25 Q. (By Mr. Rosenstock) See, now, the entirety of

                              57
1 the report was that there was an individual wearing a
2 gray hooded sweater or sweatshirt who was standing in
3 the middle of the road flipping off cars. And the woman
4 who reported it wanted to remain anonymous, correct?
5 A. Uh-huh (yes).
6 Q. There was nothing about throwing rocks, was
7 there?
8 A. She didn't say nothing.

12 Q. Well, who told you that there were rocks being
13 thrown?
14 A. From what I recall, dispatch did. And they
15 didn't tell me, they told Officer Gallegos.
16 Q. Did he tell you?
17 A. I don't recall.
18 Q. Didn't you hear the call?
19 A. I don't remember.

**(Audio playing.)**
25 Q. (By Mr. Rosenstock) Do you hear the dispatcher

                              58
1 telling No. 21 -- that was Jason Gallegos, correct?
2 A. I don't remember.
3 Q. -- that there was a report of a male in a gray
4 sweater throwing fingers in the middle of the road?
5 A. That's what she said, yes.
6 Q. Nothing about rocks, is there?
7 A. It could have been before that, it could have
8 been after that; I don't remember.
14 Q. Well, your attorney went to 911 to get all the
15 documents, and this was it. So there was no call about
16 rocks being thrown, was there?
17 A. Not what she said.
18 Q. And who was it who said, "Well, he's only got
19 ten of them, so he can't throw them too far"?
20 A. I don't know.
21 Q. Was that you?
22 A. Probably.
23 Q. What did you mean by that?
24 A. No idea.

59
15 (Audio playing.)
16 Q. (By Mr. Rosenstock) Is that Jason?
17 A. Yes.
18 Q. Is that you?
19 A. Yep.
20 Q. Now, the dispatch call shows that nothing was
21 said about rocks being thrown, correct?
22 A. Correct.

60
24 Q. (By Mr. Rosenstock) So you arrive on the
25 scene. And the individual you see, you didn't know who

61
1 he was?
2 A. Correct.

19 Q. How did you learn that his name was George
20 Gallegos?
21 A. After the incident took place, we found out who
22 he was.
23 Q. When?
24 A. I don't know when.

63
2 A. I don't recall.
3 Q. And Mr. Gallegos was standing with
4 those -- what you say were two children, correct?
5 A. Yes.
6 Q. And you both got out of your cars, correct?
7 A. Yes.
8 Q. And Mr. Gallegos was -- you don't recall what
9 he was wearing; is that correct?
10 A. I don't.
11 Q. And you didn't mention that you saw a weapon on
12 him, did you?
13 A. I never saw a weapon, no.

18 Q. Then you got out of your vehicle?
19 A. Yes.
20 Q. And the two of you approached Mr. Gallegos,
21 correct?
22 A. Officer Gallegos was already approaching him by
23 the time I got there.
24 Q. Okay. You walked with him, you caught up to

25 him, didn't you?

                                64
1 A. Shortly after, yes.

14 Q. And you wrote that Officer Gallegos began to
15 speak to this male individual who we now know is
16 Mr. George Gallegos, and he had his hands in his jacket
17 pockets; is that right?
18 A. Hands in the pockets of his jacket, yes.
19 Q. And it was approximately 7:30, 7:45 in the
20 morning in February, correct?
21 A. Yes.
22 Q. And that's not unusual for somebody to have
23 their hands in their pockets in the morning in February
24 in Espanola, is it?
25 A. No.

                                65
1 Q. It's certainly not a sign of any criminal act,
2 is it?
3 A. No.

7 Q. In that dispatch call, there was no report of a
8 weapon, was there?
9 A. Not that I recall.
10 Q. There was no report of an argument taking place
11 on the street?
12 A. Not that I recall

                                66
2 (Discussion off the record.)
3 Q. (By Mr. Rosenstock) There was no report of
4 this individual yelling, was there?
5 A. No.
6 Q. No report that he was using fighting words
7 towards anyone?
8 A. No.
9 Q. No report about any active violence taking
10 place, correct?
11 A. No.
12 Q. Just that somebody was throwing fingers at a
13 car?
14 A. Standing in the middle of the road.
15 Q. Right. No one had reported that this
16 individual had actually thrown the finger at them, had

17 they?
18 A. The caller that called in the incident.
19 Q. She didn't say that she was the subject of
20 that, did she?
21 A. No.
22 Q. Throwing the finger is sort of a way of
23 expression of disrespect towards somebody, isn't it?
24 A. Correct.
25 Q. But it's not a crime, is it?

67

1 A. No.

20 Exhibit 3 here. Exhibit 3 is a document produced from
21 the 911 -- Espanola 911 center for all CAD logs for the
22 three months prior to February 21st, 2014, referencing a
23 male subject on Railroad Avenue. Do you see that?
24 A. Uh-huh (yes).
25 Q. If you look at the first page of the document

68

1 itself, there's a call on February 12th, 2014 at 7:59
2 claiming that a male subject was cursing at passing
3 cars. Do you see that?
4 A. Yes.
5 Q. And if you keep looking two more pages in,
6 there was a call on January 10th, 2014 of a male across
7 the street on Railroad Avenue yelling at a vehicle,
8 yelling at vehicles. Do you see that?
9 A. Yes.
10 Q. Nothing said about rocks being thrown in either
11 incident, were there?
12 A. It could have been before the three months --
13 or correction, after the -- it could have been four
14 months, five months, six months, seven months. It could
15 have been further back than the three months that you
16 requested.

69

19 Q. What were the grounds for arresting him at the
20 time you first saw him standing there?
21 A. It could have been disorderly to the public
22 around the area --
23 Q. What did he do?
24 A. -- or he could have been disorderly -- there
25 could have been a number of reasons.

70

1 Q. What evidence did you have that -- go ahead.
2 A. At the time --
3 COURT REPORTER: One at a time, please.
4 A. At the time, I didn't have nothing.

19 Question: "So at what -- at that point,
20 you were involved in what would be called a consensual
21 encounter, in your opinion?"
22 Answer: "Correct."
23 Do you have any basis to disagree with
24 Officer Gallegos on that?
25 A. That's his opinion, not mine.

71

1 Q. Do you disagree with him?
2 A. If that's what he said, that's what he said.
3 Q. Do you disagree with him about what was going
4 on there at that point?
5 A. I don't agree or disagree with him.
6 Q. You have no opinion?
7 A. I don't have an opinion.
8 Q. If you had no basis for an opinion, you don't
9 have an opinion of what the nature of the encounter was
10 at that point?
11 A. Not on Officer Gallegos's part.
12 Q. Well, what's your opinion?
13 A. I don't know what Officer Gallegos had --
14 Q. I asked you what your opinion is.
15 A. My opinion? I don't have an opinion in this.

73

8 Q. You didn't grab Mr. Gallegos's left arm and
9 twist it up behind his back?
10 A. I did.

74

10 Q. And you had his left arm and Gallegos had his
11 right arm, correct?
12 A. Correct.
13 Q. And Mr. Gallegos was crying out that he was
14 being hurt, wasn't he?
15 A. I don't remember

7

77
20 Q. And so you wrote that "After Mr. Gallegos was
21 told to take his hands out of his pockets, he continued
22 to walk towards Officer Gallegos with his hands in his
23 pockets," correct?
24 A. Correct.
25 Q. And "At that time, Officer Gallegos attempted

78
1 to handcuff Mr. Gallegos," correct, "for our safety"?
2 A. Say that again.
3 Q. At that time, you wrote, "Officer Gallegos then
4 approached Mr. Gallegos and attempted to place him in
5 hand restraints for our safety"?
6 A. Correct.
7 Q. So you said earlier you meant handcuffs. Same
8 thing, right?
9 A. Yes.
10 Q. Okay. So he was placed in hand restraints or
11 handcuffs because when he was told to take his hands out
12 of his pockets, he didn't?
13 A. Correct.
14 Q. Describe to me what Officer -- what you claim
15 you saw Officer Gallegos do at that point.
16 A. What do you mean?
17 Q. Well, you say you approached him and attempted
18 to place him in hand restraints. What did you guys do?
19 A. We placed him in hand restraints.

79
18 Q. But what was Mr. Gallegos doing that caused you
19 to think there was a need to handcuff him?
20 A. Like I said, Officer Gallegos did what he did,
21 I just assisted. I didn't know what was going on, i
22 just assisted in placing this individual's hands behind
23 his back.
24 Q. So you don't know why Officer Gallegos grabbed
25 his right arm?

80
1 A. I don't.

13 Q. And you had him facing the unit while he was
14 being handcuffed, correct?
15 A. Correct.
16 Q. And his face was actually down on the unit,

17 wasn't it?

18 A. I don't recall that.
19 Q. You don't recall one way or the other?
20 A. No.

            81

21 Q. So you had him against the vehicle, and
22 Gallegos -- Officer Gallegos has his right arm up behind
23 his back, and you say he was still resisting somehow?
24 A. Yes.
25 Q. He was resisting having the handcuffs placed on

            82

1 him, is what you're saying?
2 A. Yes.
3 Q. And Gallegos -- Officer Gallegos then put
4 Mr. Gallegos in the back seat of his police unit,
5 correct?
6 A. Correct.
7 Q. He was told to have a seat there, correct?
8 A. That's what Officer Gallegos told him.
9 Q. And Gallegos told him -- Officer Gallegos told
10 Mr. Gallegos he was not under arrest, correct?
11 A. I'm not sure.
12 Q. Isn't that what you wrote, "Officer Gallegos
13 did state to Mr. Gallegos that he was not under arrest"?
14 A. That's what I put in my report, yes.
15 Q. And when he was placed in the unit in
16 handcuffs, correct?
17 A. Correct

            83

8 Q. But you didn't see a patdown search?
9 A. I didn't do one, so I don't recall one.

17 Q. Well, you were watching the whole incident.
18 You were participating in it, weren't you? You saw
19 Gallegos put Mr. -- Officer Gallegos put Mr. Gallegos in
20 the police car, didn't you?
21 A. Yes.
22 Q. Okay. And you were there with him when the
23 handcuffing occurred, correct?
24 A. Yes.
25 Q. And he took him from the -- once he was

84

1 handcuffed, he put him in the police car, didn't he?
2 A. Yes.
3 Q. And did you see a patdown search done?
4 A. I didn't see one, but that doesn't mean that it
5 didn't happen.

17 Q. And what was the reason he was placed in the
18 police car in handcuffs?
19 A. No idea.

23 Q. And you wrote that "Mr. Gallegos was then
24 escorted to his residence down the street," correct? Is
25 that what you wrote?

85

1 A. Yes.
2 Q. You wrote before that that the two of them,
3 Officer Gallegos and Mr. Gallegos, began speaking. Do
4 you know what they said?
5 A. No idea.
6 Q. Where were you when they were speaking, you saw
7 them speaking? Where were you?
8 A. The opposite side of the vehicle, probably. I
9 don't exactly know where I was standing.
10 Q. And you say he was then escorted to his
11 residence?
12 A. Yes.
13 Q. Why was he taken in the police car to his
14 residence?
15 A. No idea.
16 Q. And was he told that he had to leave the area,
17 the area of the bus stop? Did you tell him he had to
18 leave the area?
19 A. I don't see it.
20 Q. Did you tell him that?
21 A. I don't recall.
22 Q. Would you have had any authority to tell him he
23 couldn't go back to the bus stop area?
24 A. No.

88

9 Q. Now, Mr. Gallegos hadn't tried to flee from the
10 scene prior to the time Officer Gallegos took him by the
11 arm, correct?
12 A. Correct

22 Q. My question is, he didn't try to physically
23 attack you?
24 A. Correct.
25 Q. And I may have asked you this, but Officer

                       89
1 Gallegos testified he had no information that a fight
2 was about to break out when you arrived at the scene; is
3 that correct?
4 A. A fight between who?
5 Q. Between anybody at the scene.
6 A. No.
7 Q. And you didn't see a weapon at the scene, did
8 you?
9 A. No

                       90
12 Q. And so Officer Gallegos never claimed he found
13 a weapon, did he?
14 A. Not that I know.
15 Q. So if there was a patdown search done, no
16 weapon was found, and then Mr. Gallegos placed him in
17 the police car, correct?
18 A. Correct.

                       91
12 Q. (By Mr. Rosenstock) Well, if a patdown search
13 was done and there was no weapon found, what basis would
14 there be to keep him in the car?
15 MR. ROMERO: Same objection.
16 A. That's between Officer Gallegos and
17 Mr. Gallegos.
18 Q. (By Mr. Rosenstock) Are you aware of any legal
19 basis to do that?
20 A. No

                       92
23 Q. Do you know why Mr. Gallegos wasn't just
24 released and told he could go home?
25 A. No idea.

                       93
7 Q. And once he was -- who took the handcuffs off,
8 if you remember?
9 A. I don't remember who uncuffed him.

11

17 Q. And Mr. Gallegos asked you if he could talk to
18 you, didn't he, once you were at the house with him?
19 A. Correct.
20 Q. And you said something to him about how you
21 could knock the hell out of him and nobody would know
22 the difference, something like that, didn't you?
23 MR. ROMERO: Object as to the form.
24 A. I don't recall
25 Q. (By Mr. Rosenstock) Excuse me?

94

1 A. I don't recall.

98

9 Q. But he wasn't -- you didn't get any information
10 that he had committed a crime, did you?
11 A. Who?
12 Q. Mr. Gallegos. You were told he was flipping
13 off somebody, cars. That's not a crime, is it?
14 A. No.
15 Q. And what authority did you have to tell him to
16 stay away from that area if he hadn't committed a crime?
17 MR. ROMERO: Object as to the form.
18 A. None.
19 Q. (By Mr. Rosenstock) Did you ever receive
20 training on relying on information from an anonymous
21 source?
22 A. No.
23 Q. Do you know the circumstances under which the
24 police officer can rely on information from an anonymous
25 source to make an arrest?

99

1 A. I don't know.
2 Q. Do you know the circumstances under which a
3 police officer can rely on information from an anonymous
4 source to conduct a Terry stop?
5 A. Not that I know.
6 Q. Have you been trained in the use of your
7 radio --
8 A. Yes.
9 Q. -- your police radio?
10 A. Yes.
11 Q. Have you been trained that when you arrive at
12 the scene of a call, you're supposed to radio in?

13 A. Yes.
14 Q. Have you been trained that when you leave the
15 scene, you're supposed to radio in?
16 A. Yes.

24 Q. Have you been trained when a person is placed
25 in a police vehicle, you're supposed to radio that in?

                100
1 A. Yes.

                107
6 BY MR. ROSENSTOCK:
7 Q. Now, this report that you're relying on, this
8 is a report you wrote about five weeks after the
9 incident, after you were required to file a report
10 because a complaint had been made against you, correct?
11 A. Correct

**16 (Audio playing.)**
17 Q. (By Mr. Rosenstock) That's your voice, isn't
18 it?
19 A. Yes.
20 Q. So you issued him a verbal command to stay away
21 from the area, didn't you?
22 A. That's what it says right there

                108
9 Q. Yeah, but the question was, the question, you
10 gave him that warning to stay away from the area, didn't
11 you?
12 A. I did, yes.